Case No. 16-1176 Northwestern Corporation Petitioner v. Federal Energy Regulatory Commission Mr. Shepard for the petitioner, Ms. Kafer for the respondent, and Ms. Gomez for the interveners Mr. Shepard for the petitioner, Ms. Gomez for the respondent, and Ms. Gomez for the interveners in the room.  The first is the regulation that says that there is a need to meet known increases in demand for regulation reserve caused by the advent of intermittent wind generation, and that scarcely caused enormous increases in the price of regulation services provided in third parties, which went up by several hundred percent. This is the first case in which a transmission company has operated a facility for the sole purpose of meeting a mandatory insulated service that PERC requires, and PERC's orders punish Northwestern for taking that innovative approach to an untenable situation by imposing a confiscatory rate far below the revenue requirement all parties stipulated at the outset of this case. The rate is also windfall for wholesale transmission customers, who represent 35 percent of Northwestern's demand, and now bear only 4.4 percent of the responsibility for regulation service. There are numerous disputed issues in this case, and given our time constraints, I'd like to focus on the three most egregious aspects of PERC's rate adjustments. First, PERC's complete denial of regulation down cost. Second, PERC's use of the station's maximum output, or nameplate capacity, to overstate the quantity of regulation reserve the gate station could reliably deliver. And third, PERC's denial of replacement capacity costs when gate station required emergency maintenance in 2012. Finally, and I'll stop abruptly when I have four minutes left, it's critical to address PERC's decision toward refunds in this case, because it is diametrically opposed to PERC precedent, as announced in two very recent decisions on remand from this Court issued before the rehearing order in this case, and judicial precedent governing the question of refunds, getting all the way back to Judge Randolph's seminal opinion in 1992 in Townsend Conference. Before we talk about the specific rate components, I think it's important to recognize the enormous impasse that we have with PERC over what the heart of this case is about. PERC's theory is that the gate station should have been operated like the generation fleet of a vertically integrated utility, where the majority of the system is used to provide energy, and then if you have available capacity, you slot it to meet a bunch of specific services. It could be Schedule 3, it could be Schedule 4, it could be Schedule 5, so they go up to 10 in terms of the ones you're required to present. And this trial went through all of these. It went through Schedule 10 all the way up through Schedule 2, through Schedule 10, looked at Blackstart, looked at all kinds of other ways that the company could have gained additional revenue from the way that it operated the station. Can I try to get to a fundamental question I have about this case? Yes, Judge Wilk. So this was a rate proceeding under Section 205, right? Yes. At some point in your briefing, you argue that PERC is treating this case as if it's proceeded under Section 206. Yes. That's the first of the issues that is the biggest cost loss to Northwestern as a result of this, and one of the reasons why it's a deadweight loss to us is that they denied a regulation down service. Regulation that changed the numerator from 60 down to 19. And what regulation down service is that you have to maintain a certain set point in order to be able to instantaneously drop down to meet sudden drops in load, and so you have to engage fuel costs in order to be able to maintain that set point so you have some place to drop from. And that's the third of the reasons why we take issue with that, is that they didn't have jurisdiction to modify that 60 megawatts. So if you're right about that, that they proceeded in more than just a minor rate adjustment under a recent decision pinned by our presiding judge, NRG marketing and older decisions like Western Resources. Right. Well, it's not just NRG power marketing, which is also my case, but Ameri-Main as well, issued earlier this spring. So there's been a lot of traffic on this particular subject. So isn't the, if we accept that premise and that argument, then don't we grant the petition just remand and then FERC can, I guess you can try again under 205 or FERC could under 206. You could, and we invite you indeed to do that. But the legal question and issue is, what did that, that 60 megawatts has been the rate for a very, very long time. And the Northwestern's rate proposal went out of its way to make sure that it did not get touched. Anything which was added on that by Wind Generation or anything else all got slotted to retail customers because they did not want to change something that had been established through litigation in advance. I mean, this was litigated in 2007, for example, when the interveners were arguing that it should have only been 45 megawatts. So this had been the practice for more than a decade. And FERC's position and response is, well, what you're, you can't treat the 60 megawatts as something old which hasn't been changed because now you're purporting to collect, now you're purporting to serve Schedule 3 needs by building a new facility. And so now that it's coming from a different source, we now need to change this amount. So we just fundamentally, we're at a complete impasse over whether or not something has gone out of our way to make sure that we did not change the numerator. And to the extent anything has changed by the addition of a generation station, it's only changed to the benefit of wholesale customers. Because when we were getting 60 megawatts of service from third parties, we got a bill and we passed it straight through. No muss, no fuss. It was a very, very high bill because they were charging outrageous prices but didn't cause us any issues. Now because we built a generation station, we now have a denominator and any denominator is necessarily going to reduce the amount that they're going to have to pay. So to the extent there's been any rate change, in terms of the methodology, it's only down to their benefit. Does that answer your question about that? So I guess I'm trying to get down to the brass tacks here. You don't want to remand because you want the rate that you proposed, you want your because you want basically this litigation in and you want the rate that you proposed to continue because you feel that it is a continuation of the same methodology and the same rate that it's been for years and that FERC had essentially previously approved or it had been signed off on in settlements, I guess. Not just settlements. It's two published decisions and two orders approving settlements. So four different orders to approve settlements. But that's just one component, Your Honor. That's the denominator is a very important piece of this pie but there are at least two other reasons why we have a problem with even if you found that they did have jurisdiction to make that change, why they're wrong. FERC is now saying, oh, well, you may have needed regulation down in the past but we're just going to erase it at this point. They didn't erase it before but for some reason because we're doing it from a generation station, they're going to erase it because their new approach says, if you're going to be providing from your own station, we expect you to provide evidence that you could not possibly get any revenue from any other place before you try to pass it on through Schedule 3. And their verbatim paragraphs in their opinion, which is a summary opinion, and then they repeated in the rehearing order is that we failed to provide any evidence that we couldn't get this income from any other source. Mr. Shepherd, let me ask you to try to simplify. In the usual situation, tell me where, if I have this right, in the Section 205 proceeding, FERC finds the revised rate unjust and unreasonable. They suspend it and if they order refunds, they revert back to the difference between the previous rate and what was charged but they can't do that in this case. Correct. Because the previous rate was the third party, which is gone, I mean, they're not, the company is not dealing with it. So what is FERC to do in trying to decide what the proper amount of refund would be after they find that the revised rate of 60 over 150 was... I think, Your Honor, the way David articulated it is, they will only allow us so much of the rate we proposed. Instead of comparing it to the prior rate, they're saying, here is your proposal, this is how much we're disallowing. So that's the way they would say, they're just going to say, here's what you wanted, which was 128 per kilowatt hour. I don't read your brief, I looked for this, but I don't read your brief as raising the question that Judge Wilkins posed to you because the way I read your brief is that the 60 megawatt figure was one that FERC had approved and again and again and again and they can't come back and change it. It was... I didn't see any suggestion that what FERC had to do in determining the amount of refunds is instituted to a six percent. Well, Your Honor, the 60 megawatts measures exactly the same thing, regardless of whether we're passing it through from a third party purchase or whether we are, whether we're now going to divide it by the amount that we're going to attribute the cost of the plant by. That is the question. What does it measure? It measures how much regulation service you need. That is a critical component to setting the rate and that should not have changed. By reducing it from 60 to 19 and declaring for the first time ever, you don't need to have regulation down-reserves. We're paying for regulation down-reserves when we bought the 60 megawatts from third party providers and they just decide now all of a sudden it's not just unreasonable even though we've been... They're not going to allow us to recover that because it was what? It was never just unreasonable before? So this is... Are we challenging the denominator? Yes, we are. I would love to move on to the denominator for a moment. The denominator issue in this case... We'll give you time. Go ahead. Thank you. The denominator issue in this case is that we have a 150 megawatt unit divided into three 50 megawatt specific turbines. The way the system was designed, it's to have two in operation at all the time. They have to provide a minimum of seven megawatts at all times. And to keep the third as an operational spare or if the excursions get particularly high. The initial decision's position on that was that we hadn't shown that we couldn't be running that third generator, that third turbine, and generating income from that, so why should we be passing it on? The way she decided to deal with that was by inflating the denominator to 150 from 105. And that greatly reduced our cost. The arbitrary and capricious piece of this, I can talk about why she's wrong on the merits and the evidence about the inflation of the denominator, we addressed very strongly through the evidence, particularly of Mr. Cashel, Mr. Vaughn, Mr. Merchant. All of them addressed this. I'm happy to provide the J citations for you. We cover them in our briefs. But those are the three that I'd ask you to particularly pay attention to. You just could not try to sell energy intermittently from those resources and hope to provide a reliable firm Schedule III regulation service. It just couldn't be done. She reached a different conclusion, but we have a separate problem with FERC's orders. FERC's opinion only summarily affirmed this outcome from the initial decision. And then when we said, hey, come on, we've raised this on our briefs on exceptions, we've raised it on re-hearing this question of the denominator, we get nothing in the re-hearing order. Do a word search in the re-hearing order. Use the word denominator one time in the decision. And that is in a generalized description of what it held in the case below. Just help me understand. You proposed 105 megawatt denominator. And help me understand how you arrived at that number again. That represents the maximum capacity of the two turbines plus some fluff because of the way that, that sounds terrible, I didn't mean it to say that it doesn't really matter. But because of the way CPS2 is measured, you're allowed to have a deviation from the total amount that's required. And that extra five represents the deviation from what the maximum capacity was. Those things are provided. And that's actually another thing that FERC adjusted. That was our conclusions with regard to how much we needed in order to meet CPS2. I hate to skip back to the numerator, but in your brief, you talk about how basically those two turbines would operate from a set point of 27 megawatts. That's regulation down, correct? For regulation down. So that's 27 total for the two, or 27 each? 27 for each of them. No, no, no, I'm sorry, 27 for them combined. They together needed to provide 27 megawatts. Okay. So maybe I'm not understanding this correctly. So how, if that's the case, how did that number factor into, if at all, the numerator to get to 19? All right. Because 27 to 20 is 7, and they just went one further than that. And that 7 is the, you can't, unless you want to cold start the generation facility, it has to be operating at its absolute operational minimum. And for these units, that meant they had to be always outputting 7 megawatts all the time. Had FERC chosen to ever address the crediting issue, which they never addressed, that was a principal component of the crediting mechanism was, what do you do with this 7 megawatts? And our answer was, well, we credit it to them. We're not going to make them pay for that. In fact, the crediting mechanism gets to a real, real problem at the heart of the whole regulation down piece, which is that FERC's worry about the numerator is that we're somehow going to be unjustly enriched by putting electricity onto the system, making money off of that, and then charging for it because we're using it to maintain a set point. But we had a crediting mechanism that expressly gave, to the extent there was any income at all derived from putting energy in the system, it was expressly credited against the Schedule 3 amounts because there were only, that was it. The only thing that the generation station existed to do was provide Schedule 3 service. So if any money came in from any other place, then you knew you took that off the Schedule 3 rate. FERC does not talk about crediting at all. FERC's brief at 34 concedes they didn't talk about crediting at all. The initial decision didn't talk about crediting at all because it's a denied fuel cost. It found no reason to discuss ways of crediting fuel costs. So there's no discussion about the credit issue in FERC's orders. And the initial decision itself says we don't find a reason to address it because we've thrown out so many other things. And the way that we pose it in our reply was to say, surely it can't be the case that you get to be excused completely ignoring and arguing about crediting because it's tied to an argument about fuel costs, which you summarily denied, and let one summary denial roll into another summary denial so you just decide you don't need to discuss these things. And in fact, the mechanics of the crediting mechanism are a whole different, present a whole different set of issues from the reason why I'm raising it here, which is to the extent FERC was worried that there was ever going to be any unjust enrichment from providing the set point, then they didn't have to worry about that because there's a crediting mechanism we've given all that money back. And that's what when we talk about the fact that FERC has tried to put this into the large integrated multi-state utility energy box or the way it's going to do regulation down, that's because they've got 15 other generating stations that are 1800 megawatts that are operating at their sweet spot in terms of generating electricity. And when they need to provide regulation down, they just turn it down a little bit. That's not an option for us here because we aren't selling electricity on the market. We just have to maintain the set point. Because either that or pay $15 a megawatt for a third-party provider. Why don't we hear from FERC and we'll give you time on rebuttal, unless there's... We never got to talk about refunds. Okay. You said you wanted to... I'll give you a couple minutes now to talk about refunds. Thank you. Okay. And I'm terribly sorry. You identified that, so... Well, briefly, the imposition of refunds in this case causes Northwestern to outright lose money for providing a mandatory service that FERC requires it to provide. As Judge Wilkins remembered from the LPC remand case, because it was covered in detail there and from the two orders in remand, both of which are now coming up to you again soon, there are two basic classes of cases as far as refund liability is concerned. Cost allocation rate design cases, and in those cases, it's first general policy not to order refunds. And overcharge or overcollection cases, in which it is FERC's policy in general to order refunds. The actual words of the statute are permissive. It says may. That's the whole point of Townsend-Concord. So the critical question is, did FERC or did FERC not explain the equity... Explain how it was addressing the equities in this particular situation? Given the amount of time I have left, I can just say this much. This case is clearly a cost allocation or rate design case. It's both. This case is not an overcharge or overcollection case, and if we were to redefine overcharge or overcollections the way FERC has chosen to do so here, where it's anything over the rate ultimately approved by FERC, then that would mean that FERC would always be awarding refunds. So it's clearly overinclusive. So since we have the benefit of the intervener's presence here, I guess the best way to deal with the equities of this situation is just to ask them this question. Why is it fair for you to get regulation down service for free? Why is it fair for you to pay 4.4% of a rate that you cost 35% of the cost? Why is it fair for you to receive a rate which is half of what we would be able to get from the best possible offer we ever got in 2007, and tell us that we have to bear the cost for subsidizing that service to you? And with that, I'll take this. Thank you. Thank you. Good morning. May it please the Court. Holly Kafer for the Commission. Let me start by saying that what the Commission's orders do here is ensure that the customers don't pay for more service than they need, more service than they require. They're only paying for what they're getting. That is the fundamental theory, to use Petitioner's Counsel's term, of FERC's case. Cost causation, you pay for what you get. To turn to the issues, I think maybe we should... What about the 205-206 issue? Can you tell me what your response to that is? I have a few, Your Honor, but the first one, perhaps to set you at ease, is that the Commission made the 206 finding here at JA-237. It found that the inclusion of regulation down, and that's the only part of the case implicated by this issue at all, the inclusion of regulation down is not just and reasonable. It is not consistent with the Commission's precedent, and Northwestern simply has not shown that they can't recover those costs elsewhere. So to the extent there's any concern at all about the 205-206 issue, that should really do away with it. That said, looking at what was their prior rate, their prior rate had been approved as part of a settlement for a few years before they made this proposal. And as the Court held in Wisconsin Public Power v. FERC 493 of 239 at 259, none of the parties, the Court, nor the Commission, can rely on an uncontested settlement. And that is what it was as precedent. So not only did the Commission not rule on the level of service in those prior cases, but it was an uncontested settlement, and it can't be held against anyone in particular. That said, factually looking at this, what Northwestern proposed here, they claim it's novel. It is novel. They built a generating facility for one particular purpose. It hasn't turned out to their liking, but they set an entirely new rate based on a cost of service. They were previously collecting based on contracts that did not involve any kind of cost of service analysis, did not involve a numerator, period. So the Commission was reasonable to proceed with this under 205, and Northwestern throughout the hearing put on evidence in support of, essentially it accepted the burden for a period of time, where it put on evidence, it did studies, which the initial decision simply found were not persuasive on this point, to show that 60 megawatts is just much, much more than what is needed to provide service to the Schedule III customers. Perhaps they need it for other purposes, they have real tail customers, and fundamentally the point is that they can use this station for other purposes. They are making energy sales at, in their rehearing request at JA 912 to 913, they cite some very helpful numbers, which is that in 2011 they made $6.1 million worth of energy sales from this plant. Now Petitioner's Council says, well that's all fine because we propose to credit it back, but how is it just unreasonable to force their Schedule III customers to pay those costs up front? They try to brush that off as 20% of their revenue requirement, again those numbers are in JA 912 to 913, but 20% of that revenue requirement is what the Schedule III customers shouldn't be paying because they're not benefiting from that service, they're not causing those costs. Northwestern is selling that energy and getting its return through that mechanism, which is exactly what it should be doing under the Commission's precedent. But what about the argument that the customers that were paying 35%, or that are responsible for 35% of that cost are only paying 4.4% now, I think, under the new rate? That argument presumes Northwestern's proposal, which is that 60 megawatts is needed, 60 megawatts of regulation service is needed for Schedule III customers. The Commission found directly to the contrary. So I think we can address that sort of step-by-step by going through how the Commission reduced the numbers, starting with regulation down, which is, I think Petitioner's Council described accurately as, you know, they have to maintain a certain amount of generation. They know they have to maintain a certain amount of generation, which is why they are able to make those sales, which they have done. So the Commission has previously held, long before this case, going back to Order 888, that you cannot recover the costs, that any type of generator can't recover the costs of that regulation down service because it's not going to the benefit of the Schedule III customers and because they have the opportunity to earn revenue from those sales, as they are. What the Commission did here was say, we understand Northwestern has done something different here. So Allegheny and Kentucky Utilities, the cases that the Commission discusses, are not directly controlling. That's where we've really, you know, firmly excluded regulation down before. Here, if you can come back to us and show evidence that those costs are just simply unrecoverable, then please do so. And the thing that's perhaps most concerning is that in the very first hearing order in this case, October of 2010, three months before the plant went into service, the Commission said, Northwestern, you have not explained why you proposed to depart from precedent on that very issue, regulation down. And that was more than six years ago now, more than seven years ago now, three months before the plant went into service, and they still have not taken any action to mitigate what they say are their losses. More on the topic of regulation down, because it is the biggest reduction, I do want to point out that really the Commission did thoroughly address all of their arguments, and I think that their concession that there is value in that service to Northwestern's customers, not its Schedule III customers, but to its other customers, should really just kind of close that issue entirely. I think perhaps it would be best to go directly to the issue of refunds. Sure. Judge Randolph, I wanted to start with your question about how exactly the Commission is calculating refunds here, first by saying that there's no dispute about how the refunds should be calculated. There's a dispute about whether they should be granted at all. Sure, that's fine. But the way that the Commission has always calculated refunds, unless there is some kind of intervening dispute in an overcharged case, is that the utility has to refund the difference between its proposed rate, which it was allowed to charge because it was put in effect subject to refund during the pendency of the case, and the rate that was ultimately found to be just and reasonable. So all that the Commission is doing by imposing refunds here is... I thought it was... See, that's where I'm not clear. Because I thought once... I've been at 205. Once the revised rate was held to be unjust and reasonable, then the previous rate would be the measure, the baseline for the refund. Isn't that the way it works? No, Your Honor. I think maybe you're thinking of the instance where a rate could be rejected in its entirety, right? Which isn't what the Commission did here. The Commission said, we see your rate for X number. We reduce it to Y, or that should have been the other way. So the Commission has simply just reduced the total number that they're collecting, which is why this is an overcharged case and not a cost allocation or a rate design case. The Commission, in its order, relied not only on Section 205, but also on Section 206. It invoked it anyway. I guess I'm... I don't think so, Your Honor, except to the extent, as we were discussing earlier, that the Commission did make an alternative 206 finding on the regulation down costs. These charges are... The refunds are imposed solely under 205. It's just a very standard case, and I would point to the case that we cited in our brief at page 53, Westar Energy v. Sperk, 568 F3rd 985 at 989, as providing just a very simple guide for the Court's analysis here. A rate was filed. It resulted in overcharges until the Commission corrected it by putting in place a just and reasonable rate, and the Commission refunded the difference. What the Court held there, Your Honor, is that what really matters is that the utility had notice of the possibility of refunds, and as the Commission held here, of course, Northwestern had notice of the possibility of refunds. Suspended, so to speak. Exactly. They had notice of the possibility of refunds, but that they have noticed that you would completely change the, I guess, the methodology of calculating the rate. Your Honor, Northwestern does not allege that we changed their methodology. They allege that we reduced the amount they're collecting. I have not seen that in their pleadings. So you think that this isn't a change of methodology, and so this takes it outside the NRG power case? Absolutely. There's multiple reasons, going back to where we started, for why we are well outside NRG. The first being that the Commission made the 206 finding here, and it's adequately supported by the Commission's analysis showing that inclusion of regulation down would be unjust and unreasonable. It would put costs on Schedule 3 customers that they do not cause, that Northwestern has not recovered elsewhere, JA-237. The second reason is that the Commission, that Northwestern had the burden in the first place, of course, to justify its 205 filing. So you have two bases to go on there with regard to the 205-206 question. If you have questions about how I'm arriving there, I'd be happy to answer them. On the question of whether the Commission changed the rate design, again, I hear Northwestern to argue that this is a cost allocation and rate design case for purposes of refunds, because they prefer for the Commission to follow the traditional approach it has in those cases of denying refunds, although I do have to add that the Commission does not always deny refunds in those cases. It is simply a policy that sets forth the guidelines of how the Commission analyzes a particular case. I don't see Northwestern as arguing that we've changed their rate design. They're upset that we've reduced their, sorry, that we've increased their denominator, that we've reduced their numerator, and that affects their overall recovery of their revenue requirement, which takes us back to where I started with the Commission's theory here. It is not about whether Northwestern can recover the entirety of its gate station revenue requirement. Much of that revenue requirement is being allocated to retail customers in any event. Without the Commission, of course, we have no say over that. The question is, what are the costs that are needed to serve the Schedule III Regulation Service customers? Northwestern simply attempted to put too much of the cost of this facility on those customers. It has not shown that it cannot recover those costs elsewhere, and it still has the opportunity to do so. Perhaps I can just end by pointing to the places in which they've conceded or recognized that they have those opportunities. For regulation down, they've acknowledged that they have the opportunity to file for opportunity costs under Schedule X. You can find that at JA210 in the opinion of Paragraph 30. For fuel costs, they stated their intent to evaluate the idea of revising Schedule IV so that they could recover those costs. That's at JA842, and the Commission noted it in the rehearing order at JA244. Energy sales. Again, we've already discussed that they are making significant energy sales, 20 percent of their revenue requirement, from this station. Customers for Schedule III should not be paying those costs from the beginning with just having to wait to have them credited back to them. Okay. That's all your honor. Thank you. Thank you. May it please the Court, Christina Gomez arguing today on behalf of the Interveners Montana Large Customer Group and Central Montana Electric Power Cooperative, I'm going to try to be ambitious and get to four quick points in the time I've got today. The first being that any shortfall in the recovery of costs from the gate station is really a result of Northwestern's own actions and failing to seek those costs through the appropriate tariffs. Second, that Northwestern's proposed rate here was contrary to FERC precedent and nearly ten times higher than comparable Schedule III rates that have been approved by the Commission. Third, that the refund order is consistent with FERC precedent, including in the energy case, which involves similar Schedule III issues and a similar refund. And the fourth will be to answer some of the questions that were locked directly at the Interveners. Yes. Why is it fair? That was the question with a lot of tag-alongs. And that relates to the first point I have here, because there are other options that have been pointed out throughout this proceeding. There are other avenues to recover these costs. I'll start by saying, back even before this FERC case was filed, long before the facility was approved by the Montana Public Service Commission, we told Northwestern, this was in the 2008-2009 timeframe, you are not applying FERC precedent here. You're miscalculating the costs that are going to be attributed to Schedule III customers. And you've got several other options to recover the costs from these stations, excuse me, from this station. That was at Joint Appendix, page 362, was the first reference to that. In terms of the regulation down piece of that, Northwestern admitted in these proceedings that the energy that it uses to stay at that set point is absorbed into its system. It's used by its retail customers. That's what the ALJ ultimately looked at in saying, you haven't showed why you should be treated differently from the vertical providers here, because you've vaguely stated that this energy is absorbed into your system. You haven't shown that you're not going to be able to sell it. And then throughout this proceeding...  Yes. That was in the ALJ's decision at... Excuse me. That is right around page 135 of the appendix. Okay. That the ALJ said, here's what the burdens are, I mean, here's what you need to do to There also are several other schedules that have come up, Schedule 4, Schedule 10, as FERC counsel indicated. Northwestern has still, after years, never attempted to bring those parties into this proceeding or file a separate rate to try to recover those costs through, like I said, the appropriate channels. I know I'm short on time here, but I would like to quickly go to the issue of the refunds, the question of how that applies here. I think the statute may help with answering the questions that you had, Judge Randolph. And 16 U.S.C. section 824D, right toward the end of that section, it says that the commission, after determining if a rate is just and unreasonable and if it needs to, excuse me, is unjust and unreasonable and needs to adjust it, it may by further order require such public utility to refund with interest to the persons in whose behalf such amounts were paid such portion of such increased rates or charges as by its decisions shall be found not justified. So that's where you get to, you don't go back to the prior rate, you go to the difference between. Okay. So the point I wanted to make here in referencing the Entergy case, this was cited at page 31 of our brief. FERC did the exact same thing in that case. It adopted the rates subject to refund. It looked at the Schedule 3 issues, including the regulation down issue, decided that was not recoverable, and then it issued refunds. The refunds also are consistent with the Federal Power Act's policies of protecting rate payers. Here we are, the rate payers who paid more than $30 million, more than the just and reasonable rate that was determined to apply to Schedule 3. It's not an allocation because there are no other customers other than Schedule 3 who are in this case. The state rate payers couldn't be because FERC doesn't have jurisdiction. The Schedule 4 and Schedule 10 customers, they're not in this proceeding. It's not the same customers. So there was no way an allocation could have even taken place. We ask the Court to affirm. Thank you. We have a few minutes for rebuttal. Thank you, Your Honor. I appreciate your indulgence to have us up here the first time. First of all, cost causation is not about you pay for what you get. It's about you pay for what you cause. And here, the cause is the need to provide regulation services to the tune of 60 megawatts. FERC makes some interesting arguments. FERC counsel makes some interesting arguments about credits here, and the new theme is that the damage here is that somehow customers should be required to pay for them up front. That's the new harm. First problem with that argument is I don't see it anywhere in FERC's orders, which don't talk about crediting at all, and FERC admits that at page 34. So she's just bringing a policy argument to your attention for the first time. Second of all, it's a terrible policy argument. What matters is whether or not they're going to be ending up paying for something. And if we're crediting them the entire value of anything that bleeds onto the system for maintaining regulation down service at the set point, then they're not harmed. So why does it matter whether or not we're reducing their rate up front or pretending that we sold them something at a different time? The point is they're not paying for regulation down service to the extent that any energy goes onto the system. So they're not harmed, and we are harmed if you tell us we just can't recover for providing that energy. Well, one of their themes is that you can recover the costs elsewhere. Can you respond to that? I will. That is where I'm next going. I just want to say this last thing about credits. Since Golden Spread in particular, the Commission's preferred method of dealing with any unexpected costs or costs where there's no firm determinants, you can't, you have no way of previously calculating what it's going to be, is to do it through credits. That's what Golden Spread says. We've said so many times in this case, this is why we're dealing with crediting. But there's no mention of crediting in FERC's orders, period. Look for it. It's not there, and FERC concedes that it's not discussed. As for the alternative methods, this is tiresome. We spent the entire trial arguing every possible other way to get this, from Schedule 2 through Schedule 10, Black Star, and every other potential way to try to call this something that it is not. It is always and has only ever been and only ever will be regulation service. That is the only thing it is. We face substantial liability if we start trying to double-count capacity for other purposes. That is the Mr. Merchant's testimony in particular goes into this particular problem. We cannot call something Schedule 4 capacity if we're using it for Schedule 3 purposes. And these arguments are faithless, and I will just direct you to this one place to dispose of them entirely. After telling us, go seek help under Schedule 4, go seek help under Schedule 10 as potential other alternatives, you go a few paragraphs later, and where they're denying our ability to recover fuel costs, which directly impacts both regulation up and regulation down, because after all, what's your number one variable cost if you're generating a station? Fuel costs, for which we get nothing. They tell us this about Schedule 10. Don't try to go recover this under Schedule 10. That will be a, quote, difficult proposition because it would, quote, be internally inconsistent with Northwestern's contradictory claim that it built the gate station exclusively to provide regulation services for its retail and Schedule 3 customers. So there, they will absolutely use it as a baseball bat to smash us in the head if we decide that we're going to go try to recover it under something else. So this whack-a-mole game, go search here, go search here, forgets the one basic thing. This is only a Schedule 3 service. It has only ever been a Schedule 3 service. It will only ever be a Schedule 3 service, and if any other income comes from any other place, it will be credited by a reduction in the Schedule 3 service. There is no harm in that. Do you agree that there was no change in rate design or rate methodology here within the meaning of NRG power? Public Service Commission of New York does not speak in terms of rate design. It speaks in terms of rate components, and there are multiple rate components to a rate design. The question is whether or not, and under Public Service Commission of New York is, did you change this rate component, or was it a continuation of the status quo? That's the language of Public Service Commission of New York, an older case before Western Resources, before City of... I forgot the name. City of... Sorry, the W. Justice Scalia wrote it at the end when he was here. What we are saying is the 60-megawatt rate determinant, the 60-megawatt allocator here represents and has only ever represented one thing. How much regulation service do you need? That has never changed until this order where FERC decided all of a sudden that you don't need 60 megawatts of regulation service. You only need 19 because we decided that you don't need to get regulation down service anymore. Regulation down service was an integral part of what they were getting out of the 60 megawatts in the past. And erasing it, why? Because we built the generating station, which they expect us to operate like some sort of coal-based load plant instead of the special facility that it is. That makes no sense. And finally, this question of windfall. The interveners have a chart on page 8 of their brief which purports to tell you... What's wrong with that chart? That chart talks about the cost of delivering regulation reserves inside the territory of a vertically integrated utility. All of those are vertically integrated utilities. They all have generation fleets. They are all operating their generation stations for other purposes, primarily to provide energy. It's very easy for them to just ratchet down if demand goes down, if they're operating that base load plant. Not so with us. The other reason why that is a fundamentally defective approach is this. It's not just what you can provide in your own area. We had put out RFPs. We did it in 2007. We had to do it again when the station broke in 2012. We know what the market price for delivering regulation to our balancing area is because you will find this out in the... The full citation is in the briefs. The 2007 Northwestern order, the order on our RFP. Look at paragraph 7. What does it say? The rate that we were willing to... The lowest rate we could get was a rate of $8 for 50 megawatts, scaling up to $14 for anything above that, plus $5 to deliver it. And because that rate was so high, we decided to cap it at $15. This is compared to the $1.28 rate that we produced here. And again, in 2012, when our system broke and we needed to get the replacement, we went out and we did another solicitation. What did we get? $9 for megawatt hour, plus transmission. Again, capped at $15 for... $15 a megawatt. That is far lower than the $1.28 that we offered, and it is way, way, way off the $0.28 that they're allowing us to have as our ultimate adjusted rate here. Okay. Thank you very much. The case is submitted.
judges: Kavanaugh, Wilkins, Randolph